Case number 13-7158 Teresa Weston Saunders, Appellant v. District of Columbia of Municipal Corporation et al. Mr. Parks for the amicus curiae, Ms. Anderson for the appellees. Thank you Chief Judge. May it please the court, my name is Tom Spurge from the University of Georgia. Appointed as amicus on behalf of the appellant Teresa Saunders. Today one of our third year students, Aaron Parves, will be arguing on our behalf and I'll be sitting at the council table. Thank you very much. Mr. Chief Judge, may it please the court. My name is Aaron Parves, I'm here as amicus in support of the appellant Teresa Saunders. With the court's permission I'd like to reserve two minutes for rebuttal. Ms. Saunders was demoted and terminated from the DC government by the defendants. She subsequently sued them under the whistleblower provision of the False Claims Act. Ms. Saunders claims that the defendants retaliated against her because of disclosures she made while working at the office of the Chief Technology Officer, which was headed by Ms. Suzanne Peck. The district court ultimately rejected Ms. Saunders' claim and made two basic findings. First, the court found a lack of evidence showing Ms. Peck's involvement in Ms. Saunders' termination. And second, the district court found a lack of evidence showing that the defendants had knowledge of Ms. Saunders' activities. Both of these findings were based, at least in part, on the district court's refusal to consider Ms. Saunders' pretext evidence. And when this court considers all the evidence, it should hold that summary judgment was not appropriate. Beginning with Ms. Peck's involvement. After Ms. Saunders disclosed the financial irregularities occurring at the office of the Chief Technology Officer, the record is very clear that Ms. Peck was visibly upset and furious with Ms. Saunders. Ms. Peck went to Valerie Holt, the district CFO, and asked Ms. Holt if there was anything she could do to get rid of Ms. Saunders. In other words, Ms. Peck took an act that was intended to cause retaliation against Ms. Saunders. When Ms. Holt refused, Ms. Saunders then went to the mayor himself and asked if the mayor could do anything about Ms. Saunders. And so the mayor asked Ms. Holt, who again refused. These acts by Ms. Peck that were intended to cause retaliation were purely based on the reports. Ms. Peck did not cite any errors with Ms. Saunders' performance. She simply was upset about these disclosures. This act intended to cause retaliation gives support to Ms. Saunders' theory that this was the ultimate reason for her termination, or at least played a part. None of this comes into play unless she qualifies as a whistleblower. That's correct, Your Honor. Unless she do, it qualifies her as a whistleblower. She was engaged in a protected activity as this court has interpreted the whistleblower provision of the False Claims Act. This court has interpreted that provision quite broadly to include anything that could reasonably lead to an action under the False Claims Act. And she disclosed millions of dollars of overpayment with no documentation from... She disclosed it up the chain of command. Well, she did disclose it first to the chain of command, but from there it went well beyond just her usual chain of command. Only at the direction of her supervisor. Well, she actually was communicating with the control board directly, and the control board was outside of her usual chain of command. As the CFO of the office... Was she ever reprimanded for departing from established procedures in terms of that? No, Your Honor, she was... She was doing what she was advised to do, I believe. Well, she was specifically hired to go to the office of the chief technology officer to create financial statements for fiscal year 1998. She was not hired to disclose or discover fraud. She even testified that this is the type of work that's typically done by an outside accounting firm. Once she discovered these significant discrepancies, she reported, of course, to the office of the chief technology officer as well as to the CFO, but to the control board, to the office of management and budget, the Department of Treasury, the District of Columbia's inspector general's office. Was any of that either improper, or was she upgraded for doing any of that? Was it improper, Your Honor? Right. Was she upgraded by her supervisor, by Ms. Peck, for any of that? Was Ms. Peck upset with her for specifically doing... No, no, did she admonish her for doing something inappropriate when she did those reports? No, Your Honor, she was... She was upset, we know that. Right. The allegation is, anyway, that she was extremely upset. Right. But there's no suggestion that I see that she was upset because the plaintiff had done something that set herself up in opposition, essentially, to her employer. She wasn't upset because of who she reported it to. She was simply upset because of the problems that it caused for her office. Okay, so the supervisor being upset with an employee because of problems that have come to light is not sufficient to make that employee a whistleblower. You've got to do something more. Well... One side or the other has to do something more, the employer or the employee. Well, as I said before, she did report this to other agencies that were outside. But that wasn't because of Ms. Peck being upset. Right, well, she was upset because of what she was disclosing. The content is what she was upset about. And that content is, those sort of disclosures are exactly the type of discoveries that the whistleblower provision of the False Claims Act are designed to protect, to make sure that people who have this sort of information are coming forward to prevent fraud on the government. And just because Ms. Peck might not have been upset because of who she was reporting it to, she was upset about the content of it, which... Did Ms. Saunders ever suggest that she was going to go to the press or do anything out of the ordinary? The record does not make clear whether she herself threatened to go to the press. There's no allegation. There's no allegation of that. However, these reports were very widely distributed. They were a big deal in the government. They went to multiple agencies, both within the district government itself and the federal government. Who was her supervisor at this point? She was working in the office of the chief technology officer, but she technically reported to the district CFO, Valerie Holt, not to Ms. Peck herself. Right, so Ms. Peck wasn't even her supervisor. Was not her supervisor, no, Your Honor. So her ire is almost irrelevant to whether Saunders is a whistleblower. No, Your Honor. Her anger supports her theory, supports Ms. Saunders' theory that eventually she was the impetus behind, or at least part of the impetus. All that, fair enough, it's suggestive of that, but all of that is immaterial unless she's a whistleblower. Yes, Your Honor, but it's our position that she is a whistleblower, at least under the definition of a protected activity that this court has construed from the whistleblower provision of the False Claims Act, because she was reporting on activities that reasonably could lead to an action under the False Claims Act, which is what this court has required. By the way, what claim would it have been? Eventually, these sorts of allegations could have led to a false claims action against either the district itself or maybe even against IBM. In fact, no false claims action was ever filed. Do we know that it was anything other than sloppy accounting? We do, Your Honor. The record makes clear that this was much more than just simple, negligent bookkeeping or poor accounting procedures. Ms. Saunders reported specifically on over $7 million that had been paid to IBM without any documentation. IBM submitted invoices that included employees working 24 hours a day, every day for an eight-month period. Right, which could be a mistake or it could be a fraud, right? It could be a fraud, Your Honor, exactly, which is all that's required. Is there any suggestion that, okay, so you're saying that's all that's required? Right, all that's required is that it's anything that reasonably could lead to an action under the False Claims Act. And the government argued in their response brief that Ms. Saunders didn't have any subjective knowledge that this was fraud, that she didn't use the words fraud, but that's clearly not what this court has required before. It's simply an objective analysis of whether this was something that could reasonably lead to an action under the False Claims Act. And to get back to what Your Honor mentioned earlier as to whether Ms. Peck's anger towards Ms. Saunders is relevant at all, Ms. Peck, we know that Ms. Peck went directly to the mayor himself, who definitely had authority over Ms. Saunders, and asked if the mayor could do anything to get rid of Ms. Saunders. And her direct supervisor, Valerie Holt, refused. However, when Ms. Holt stepped down in May of 2000 and Dr. Gandhi, one of the defendants, became CFO, who has a closer relationship with Mayor Williams, who had been appointed by Mayor Williams to multiple positions in the government, had a long history of working with the mayor to get control board oversight over the district government to get rid of that oversight. One month after someone with a closer relationship with Mayor Williams becomes CFO, Ms. Saunders was first demoted. I'm sorry, I'm just trying to read the Martin Baker case while you're talking on this question of reporting up the chain. The question that Judge Ginsburg was opening with. So, was this not within the scope of Saunders' responsibilities to write this report? No, Your Honor, it was not. Was she assigned to the question of writing this, of looking at these questions? She was assigned specifically to create financial statements for that year. And these discoveries that she made were much more serious than those typically assigned to a CFO to deal with. She testified that these were the sorts of discoveries that usually were handled by an outside accounting firm. Typically, when something of this magnitude is discovered, they outsource it. How did she discover it? The record seems to indicate that there were several boxes of documents at the office of the Chief Technology Officer relating to these Y2K contracts. And she and her team went through those documents. Do you think that they were acting outside the scope of their job by looking in those boxes? No, Your Honor. They were certainly hired to look into the finances of the- And when they discovered those things, wasn't it part of their job to report it? If you were the Chief Financial Officer, you discovered the kind of things you're talking about, and you didn't report it, wouldn't you have a problem? Yes, Your Honor. So isn't that within the scope of her normal job responsibility? If she had just reported it to the Chief Technology Officer and the CFO, then perhaps she falls under the Martin Baker haircraft. But she went beyond that. Her second report went directly to the control board. It was distributed to- She sent it directly? Yes, the control board asked her to send it directly to them, and she did. And the control board was- So is that going on outside of the scope of her responsibilities when the governing body asks her for it? Well, they were asking because they were looking into these things that she had discovered. And so it was outside of her usual reporting procedures. Typically, she just reports directly to the CFO or to the agency. So here's hypothetical for you. Inspector General of a government agency finds fraud in the agency. That's his job. The title of the job of the Deputy Inspector General is find fraud in this agency. The Inspector General finds fraud. Now, at that point, there's no possible False Claims Act whistleblower claim or anything available. Is that right? Right, Your Honor. Okay. And then Congress hears about this and says, send us your report. And they send the report. Does that change? There is a separate one for sort of reporting to a government body and being punished for it, isn't there? Isn't there some kind of separate retaliation theory about that? There probably is a retaliation statute. More like a First Amendment argument. Right, Your Honor. However, this was an action that could lead to a False Claims Act. It reasonably could lead. And she did report to-it wasn't just the control board, Your Honor. It was also the Office of Management and Budget, the Department of Treasury. The Government Accountability Office, the General Services Administration. These were agencies that typically Ms. Saunders was not involved in. She testified that in her 18 years of experience in the district as a CFO, she had never had meetings with some of these agencies before. These were things that-this was more than just simple- Well, you mentioned the control board asked for it, how to get to GSA. Was that her initiative? I'm not sure. The record doesn't make clear. Perhaps it was just sent between the different agencies. We know from the record that several government agencies within the district government had to set up liaisons and new reporting procedures between the government agencies. So there's no allegation that she sent it to anyone outside of either her chain of command or an appropriate request? It's our position that she did report it outside of her chain of command. What is the allegation? What's the evidence? Well, the record makes clear that she sent it to the control board, at least specifically. That was at their request. Well, it was at their request after her original report had been sent to the CFO, and they realized that there were serious issues occurring. I understand that, but insofar as it goes to the CFO, the boss, or to the control board at their request, she's not setting herself up as a whistleblower. If she sends it to the FBI on her own initiative, we have a different case. Yes, Your Honor, but just because she didn't go extremely outside of the chain of command, she still went outside of her chain of command. Her chain of command was simply— At least you said we don't know how GSA got a hold of it. It was sent between a bunch of different agencies within the government. It doesn't make clear. So what's your support for saying she sent it outside her chain of command, except for the control board, which was on request? Well, whether she sent it or not, it was eventually circulated outside of her chain of command, which makes it—the purpose of the Martin Baker aircraft exception is to make sure that employers are on notice that what the person is doing might be a protected activity, might lead to a False Claims Act claim. And so Martin Baker doesn't make it clear whether the person has to, of their own initiative, take it to someone outside the chain of command. This report was distributed outside of her chain of command, which would put her employer on notice that, first of all, she was engaging in potentially protected activity that could lead to some sort of litigation later, whether she had subjective belief of that or not. I take it your principal argument here is that she was just on a limited project to do the financial statements, and that was not the assignment to do this entire analysis that she did. Yes, Your Honor, that's correct. I'm sorry to interrupt. No problem. The district court also found that there was no evidence showing that the defendants had knowledge of Ms. Saunders' activities. Let me be clear. The evidence was that OMB and the Treasury Department requested the district government to provide these financial reports. Mrs. Holt, the CFO, told her client that the Office of Technology was in a mess. Go look at these 15 boxes and prepare the reports. Mrs. Sanders did that, but she found she couldn't prepare the reports because she found these problems. So she wrote up a report. She presented it to Mrs. Holt. Mrs. Holt and the city administrator, Mr. Dang, told her to amend it. And, indeed, it said that she couldn't tell until she got the records whether OMB had been, whether IBM had been improperly paid or not. So she files this report. She goes, and there's a meeting, all right, and the control board is at the meeting, and they want to see the report. Do you think it's at all relevant that Mrs. Sanders is operating in a new governmental construct created by Congress to help get the district's fiscal affairs in order? And until it was able to show that it had done that, the control board would continue to exist. And the CFO was set up precisely to find out where all the problems were in these agencies. And wasn't that what Mrs. Sanders did? Your Honor, my time has expired. May I briefly respond? At least we got more questions, I'm sure. It is relevant that there was problems at the office of the chief technology officer when Mrs. Sanders was set up. Throughout the district government, according to Congress. Correct. That's why the control board was set up, actually. And Your Honor's explanation of the control board and its relationship to the district government supports our argument that Mr. Cabell, one of the defendants, had knowledge of these reports. He claims that he didn't. However, given his position on the – Let me just be clear. The chief judge gave you a hypothetical of the inspector general, who issues a report about an agency pointing out all kinds of problems. Six months pass, and the department does a reduction in force. Now, this doesn't work because the inspector general is this independent position. But let's suppose it's not, and that the agency head could extend a reduction in force to this subordinate inspector general. Could the inspector general bring a whistleblower claim under the False Claims Act? Well, I think the distinction there is in the nature of their positions. Now, take my hypothetical as I gave it to you. This is an employee of the agency who uncovers reporting problems, such that the agency cannot prepare its financial reports. In Your Honor's hypothetical, that person probably could not, because their specific job description is to deter fraud or discover fraud. Whereas Ms. Saunders' position as a CFO is simply to create financial statements to prepare them so that the district could see where the problems were and work to get – So the district could respond to OMB and the Treasury Department. That was her initial assignment, wasn't it? And she's a CFO. That's correct, Your Honor. That was designed to find out all these problems with the district's accounting system. Specifically to create reports of how the government – or how the agency was spending the congressional funds, yes, Your Honor. Okay. And given that the control board had such close oversight, as Your Honor explained, Mr. Cavell's explanation that he had no knowledge of these reports simply doesn't make any sense. His position was – for his position on the control board, part of his job was to make sure that these problems did not continue. They needed one more clean audit to remove control board oversight. This goes to the second theory, right? You have two theories. One is the PEC did it either directly through Williams and Gandhi, or number two, that Gandhi and or Cavell on their own did it, right? Yes, Your Honor. So let me ask you about that one. I read the opposition to the motion for summary judgment. I find it a little hard to see that – more than a little hard to see that theory in the opposition. But you're treating this as a question of whether the argument was forfeited or waived by being raised below, and I want to ask it a different way. The district court in this case was presented with that theory on reconsideration, right? Yes, Your Honor. In the 60B motion, right? Yes, Your Honor. And she denied it, saying it was new. In her view, it was new, right? That's correct. The standard for our review of 60B motions is not, well, is it forfeited or not, or waived or not, and do we think it's unfair, or do we want it? It wasn't an abuse of discretion by the district judge, right? Correct. So for us to consider this second theory, the issue is not really whether it was hinted at, inferred, etc. below, but whether the district court abused its discretion in regarding it as a new theory, right? Yes, Your Honor. That is the correct standard for reviewing the Rule 60B motion for reconsideration. However, it's our position that Ms. Saunders' argument in that Rule 60B motion was correct, that this was not a completely new theory. Right, but it wouldn't be enough for us to conclude it was correct. We would have to conclude it was an abuse of discretion by the district court to say that it was not, right? Well, this court could also look at just the original summary judgment motion and the response and do the de novo review on that portion of the materials and not even look to the motion for reconsideration to determine whether under de novo review that argument was. . . Well, if we don't overturn her decision to reconsider, then I don't see how we can get to that argument. You ask that specific thing. She specifically ruled that it wasn't raised, and we have to decide whether that was an abuse of discretion. What's your best argument? Your brief cites the derogatories, complaint, et cetera, but when it comes time to argue about summary judgment, we have a lot of cases that say you can't sort of bury your claims somewhere in the district court record. You have to present them to the district court. So the memorandum of points and authorities is the place, right? Yes, Your Honor, in the response to the motion for summary judgment. Right, right. So as I read it on page 20, I guess maybe you could tease out the argument you're making, which is a very good job for amicus. I always appreciate it. But the question is whether the district court could have teased that out. I'm finding it a little difficult to see, and I see the argument that Peck was the mover here. I don't really see the argument that Gandhi or Cabell, independent of Peck, were. Do you agree with what I'm saying? It's true, Your Honor, that counsel below did not explicitly connect those dots in the way that we have in our brief. However, it's our position that Ms. Saunders from Moushadah, you can't suddenly come to the court of appeals or even to the district court after a judgment and say, hey, you know, we got a new theory here. It's better than our old theory. Well, it's our position that it was not a new theory. It's our position that in the response to the motion for summary judgment, counsel simply laid out the story of what happened and didn't explicitly even argue for just the purely Peck's motivation theory, but simply just laid out what happened, how both of the named defendants were involved. Specifically, beginning on page 334 of the joint appendix. On page what? 334 of the joint appendix. Ms. Saunders' response to the motion for summary judgment lays out how the office of the chief technology officer was having trouble documenting their financial reports for this 14-month period. Talks about how clean audits were important for the mayor as well as for Mr. Cabell and his position at the control board. And talks about how Mr. Cabell was involved as the CFO for 12 of those 14 months. Talks about how Dr. Gandhi's story about her demotion and termination is untrue. Talks about the close ties between Mr. Cabell, Dr. Gandhi, and the mayor. It can't be enough to lay out a bunch of facts in something like this. You have to lay out a theory. Actually, you make a good point, which is in the theory part, there's no theory. Right. Well, that suggests summary judgment was an appropriate period. Now, maybe there's, I hate to whisper these words twice in the same day, but maybe there was ineffective assistance of counsel below. But if you don't even present the district court with a theory of animus, then it's true we review de novo, but we have to review something de novo, and the something has to be the claims that are presented, not, no, here's 20 pages of facts and see if you can figure out the theory. I think, despite the fact that it wasn't clearly laid out, reading the response to the motion for summary judgment as well as the summary judgment materials, the interrogatories, the complaint itself, and other depositions, it's clear that Ms. Saunders believed that these defendants were involved in her termination, that they had something to do with it from the very beginning. The complaint itself says that the defendants were directly responsible for her termination, not Ms. Peck. The complaint says that the defendants were responsible for this. So let's go, just let me think for just one second since we're way over on, what is the theory that Gandhi and Cabell had any animus against her? Well, the theory, Independent of Peck. Right. So they were both in positions in the district government where getting rid of control board oversight by getting one more year of clean audits was crucial to them. Yeah, but so they have an example of something she did in the past, really good work in the past, but that work is done. So why would they punish her for, I mean, what's the reason that they, some theory that they would think that the next time she did an audit she would be super careful again and they wanted somebody who wasn't super careful, is that the theory? Well, there's two specific things I would point to, Your Honor. First is the fact that a reasonable jury could find that they wanted to make sure that these sorts of issues didn't come up again. And that's why the mayor set up that task force and Mr. Cabell put your client on it. Right. So that these kinds of issues and problems could be identified and the financial report would not be delayed. In other words, they brought her into the loop. They didn't exclude her from the loop because of what she had done. They were taking advantage. They wanted somebody in there who could get rid of these problems and help them get this report done in a timely manner. Well, in fact, Ms. Saunders' move to the special projects team was a demotion for her. She was no longer a CFO. She alleges that. Right. But Judge Rogers is on to this point here, which is why would you bring the person that you're afraid of finding audit mistakes into the task force for finding audit mistakes? Well, Your Honor, first of all. If your goal is to not find audit mistakes. Well. That seems really unthought of it that way, but Judge Rogers raised a point that really seems quite striking here. Well, a reasonable jury could find that they did that to move Ms. Saunders directly under Mr. Cabell's supervision at the special projects team before she was at the lottery where she was under the supervision. On the lottery, she's not going to be finding anything in OCTO or anything like that. Right. But also at the lottery, they don't have the ability to terminate her, which is what they did one month after they brought her to the special projects team. Again, your theory is, as we just discussed, your theory has to be that for the next audit, not the past one, she's going to find something that's going to slow things down. That's your theory. Or disrupt the ability to get rid of her. Yes. It seems like the right place to keep her is in a lottery where she's not going to, just what Judge Rogers asked. I'm sorry to repeat what you asked, but just what Judge Rogers asked. Why not leave her in a safe place where she can't disrupt Cabell and Gandhi's program, if we assume that there is such a program? Well, respectfully, a reasonable jury could find the inference that I explained before, that they brought her to the special projects team so that she would be where Mr. Cabell and Dr. Gandhi would have the ability to terminate her, which they did exactly one month after they brought her on board. Perhaps they were still angered by the issues and the delays that her original reports had caused. I mean, what you want us to do and want the jury to do is to, you say counsel below maybe didn't connect the dots, but the problem is, is the evidence there from which a reasonable jury could draw reasonable inferences of animus as to Gandhi and Cabell. And the only theory is that they were, because they held those positions, they necessarily would have had animus against anybody who found problems that their office was designed to find and correct. And doesn't that just collapse on its own weight? No, Your Honor. It's our position that there is sufficient evidence that a jury could find that, in order to make sure that they got the last audit that they needed, clean audit that they needed and got rid of... So what the government really wanted to do was not to bring in anybody who could help them find mistakes, but get their financial reports out in a timely manner and then have OMB and the Treasury Department and the Congress say, well, we have to keep the control board in even longer, because there are all these problems with the financial report that weren't found by the district government, because Mrs. Sanders wasn't there to identify them. Well, they wanted to make sure that they... I mean, these people are, you know, the mayor had worked for the control board. I mean, these are sophisticated people dealing with the federal agencies in Congress. That's correct, Your Honor. And they wanted to make sure that they got that last clean audit that they needed, and it's a reasonable inference from that that they viewed Mrs. Sanders as an obstacle to doing so, given that her disclosures about the IBM issues had posed such a huge problem for them in closing out both the 1999 and the 1998 comprehensive annual financial report that they decided that they'd rather not take the risk that she would pose some sort of problem in the future. I would have suggested a completely different inference for your information, which is that Ms. Peck, having drawn, let's say, a red line and laid down a red line and then had an important credibility stake in following through and making sure that Mrs. Sanders never worked in the D.C. government again. Yes, Your Honor, that's certainly something that the jury would also consider. That's maybe a warped view of the world, having grown up in Chicago. Perhaps, Your Honor. The judge's question asked me to consider just the independent motivations, but it is our position that when you consider Ms. Peck's intent, her explicit retaliatory animus, on top of the independent motivations and their relationship with Mayor Williams, that a reasonable jury could find that some combination of Cabell's, Gandhi's, and Ms. Peck's animus led to her being terminated because of her protected activity. Of course, your client had all kinds of other theories why she was terminated, too, but she didn't bring those claims in time. She also had a gender discrimination and a racial discrimination claim that she did not oppose summary judgment on below. Well, she was barred by the statute of limitations. Right, Your Honor, so all that's left is her False Claims Act retaliation claim. And the only evidence as to Mrs. Peck and the mayor is a press release issued by the mayor's office, along with the chairman of the city council, regarding the mayor's effort to get more control over the school board, and it merely mentions two organizations that were supportive of this. And somehow that is enough to connect Mrs. Peck because her husband contributed money to these organizations, and Mrs. Peck did, too. That is one piece of evidence, Your Honor. There's also the testimony of Ms. Holt, who testified that Ms. Peck had gone to the mayor to see about this. Oh, she testified somebody, the chief of staff. Right, someone in the mayor's office. So Ms. Peck had gone. I thought it was the chief of staff. Yes, Your Honor, which means that Ms. Peck had somehow gotten in touch. We don't know. That's the gap in the evidence. Well, Ms. Holt testified that the mayor's office asked if there was anything she could do about Ms. Saunders because Ms. Peck. A lot of people say that. That's all I'm getting at. I mean, I think you have to connect the dots. All right, we've gone way over. We'll probably give you time anyway because we're really easy here. But let's move on to the other side. Thank you, Your Honor. Good morning, Your Honors. Chief Judge Garland. May it please the Court. Stacey Anderson on behalf of the district appellees. The Court should affirm summary judgment in the district's favor in this case. I'd like to discuss, I think, the causation element, which is what the district court focused on and what the court focused on this morning. As for whether or not Ms. Saunders engaged in a protected activity that was known to her employers, the record indicates that she was working within the scope of her employment when she made the disclosures that are at issue here. She was on a special assignment, and her job was to prepare not only financial statements but also she was supposed to. How long was the job supposed to be for? Initially she was given two weeks to prepare the financial statements. This seems a little bit outside the scope of the two weeks, doesn't it? Yes, Your Honor. But, again, it wasn't limited to preparing the financial statements alone. She was also, in her words, to assess, issue a performance report on operations. In other words, to delve into the manner in which the Y2K funds were being expended, the manner in which OCTO was approving those expenditures. So she simply wasn't to produce the financial statements, but in her own words was also to issue this performance report on the actual operations of the unit. Isn't there a, I mean, when it's described this way, you're given two weeks to do all the financial statements and whatever these other things. Don't we, like, at least have a jury question on whether this was in the scope of her responsibility or not? That's not a legal question, right? No, Your Honor, I think, I mean, it is. It is a fact question, right? Yes, whether it was within the scope of her responsibility. I'm relying on her own testimony. Outside Joint Appendix 89, 98, and 152, it was her testimony that she was to produce these reports, that that was part of her assignment. There's no indication that anybody thought she was doing anything that she wasn't supposed to be doing or was assigned to do. Not being supposed to. I know I put it that way, but that's not really the question. It's not as if she was doing something unlawful or something. The question is whether she roved outside of her. And, again, I don't believe so, Your Honor. She was in contact with CFL. Let me just ask another question. I think I already know the answer now that we've talked about it, but imagine that it was within the scope of her responsibility. She found fraud and the mayor said, you know what, I'm firing you because you found fraud. Absolutely. What was the claim there? What would her claim be? That would be a false, retaliation of the False Claims Act. And why would that be? If it was within her scope of responsibility. Oh, I'm sorry, I misunderstood. If the mayor says, because you disclosed fraud, that shows that. . . No, the mayor says, look, you found fraud. I don't want anybody in my administration finding fraud. Right. The question about whether or not it's within the scope of her job duties goes to the question of whether or not the employer would have knowledge of her protected activity. So in your hypothetical, given the mayor's statement, somehow he was aware that she was disclosing fraud. But was it protected activity under those circumstances? So is that . . . That's . . . I think there is this question about whether this is only a notice question or whether it's actually protected. Well, I mean, I don't think it's protected because I don't think she disclosed fraud. I'm asking in my hypothetical. But in terms of the notice, would someone reading her reports be put on notice? Yeah, but so imagine that this is her assignment. Let's say she's the inspector general. My job is to find fraud. I found fraud and leave the mayor out because he's elected. But let's make it the CFO. The CFO says, gee, you found fraud. That looks bad. You're fired. And by the way, here's a notice to all employees. Don't ever find fraud again because I will fire you. Right. So is that a False Claims Act problem? Is that a Whistleblower Protection Act kind of problem? What is that? I think the Office of the Inspector General presents a unique circumstance. So I think . . . But I do have an answer, I think. Imagine it's just a plain old employee. Imagine it was her in this case. Right. Imagine it was her and this was her job to find fraud. She wasn't the inspector general. Then again, I think she has to provide notice that she's acting outside the scope of those fraud-seeking duties. And for your inspector general's example, what I would say is probably typically an inspector general going outside and investigating a government agency and uncovering fraud would not provide him with whistleblower protections. But perhaps if he was not on assignment and he uncovered fraud within the Office of the Inspector General and reported that, that might give rise. Because that is not necessarily part of his assignment. I'm not being clear. It's my fault. The question is, I am a government employee whose job it is to find fraud. I'm not in the . . .  For some reason, I'm not in the inspector general's office. I find fraud. I report it to my immediate supervisor only, nobody else, as I'm supposed to. And the immediate supervisor says, you know, I know it's your job to find fraud, but actually we don't want anybody to find fraud here. You're fired, and puts it in writing. What is the cause of action of this? I'm sure there is a cause of action available to the employee. What is it? I'm not sure, Your Honor. You think it's not the False Claims Act? I don't believe so, Your Honor. No. Again . . . No. No. I mean, again, the purpose of the . . . It could be Merit Systems Protection Board or some action you bring before . . . I mean, it's tricky because she's an at-will employee. Yeah.  But . . . It could be a . . . I don't know. Again . . . What is the false claim that you filed in that situation? Right. And, again, I think . . . I don't know the answer to Your Honor's question, to be honest. I think those present much more difficult questions than the one that's before the Court here. Her . . . Again, I'll go back to our original position. She didn't disclose fraud. I think if you read the reports, there's no allegation of fraud in there. So, would your position be that she would have to have sent her reports to the FBI or to the U.S. Attorney? No. I think my position is that she would have had to identify fraud and had to have indicated that . . . She would have had to say to Mrs. Holt, who was her supervisor. Right. I think IBM is defrauding the government. I believe that the requests for payment in this case are false. And what we have here is not an allegation . . . And then what? And then she would have made a protective disclosure at that point. To Mrs. Holt? To Mrs. Holt. You can't make a . . . the disclosure can't be to your employer. It's my understanding. It does not have to be outside . . . Her job is to find fraud. She tells her supervisor that she's found fraud. And she's fired because she found fraud. And she's an at-will employee. What is her cause of action, if any? Again, I dispute that her job in this case was to find fraud. No, I understand that. This was a hypothetical. Again, I don't know. I'm not sure I know the answer to that question. I think it's a very difficult question where you have an employee who was actually engaged in a search for fraud and what happens when they find fraud and are terminated. I'm sure there's a case law out there, and I just simply haven't looked at that, and I'm not quite sure . . . Right, and I'm not sure either. Well . . . All right. But I just . . . in terms of the analysis, I'm not quite sure how the court would come out on that. I do know in this case . . . What I'm trying to understand, though, is from the defendant's perspective, whoever is named as the defendant, at what point are you aware that this could rise to the level of false claim if the employee is acting within the scope of his or her employment? When the employee comes to you and says, I've uncovered fraud. Well, I'm thinking about some of the cases we've all read about, just very public in the Defense Department and elsewhere. And I'm just trying to think of the situation where notice isn't required, but some action is required . . . Sure. . . . on behalf of the employee that is incompatible or inconsistent. And along the lines of the questions Judge Ginsburg was asking, was she ever disciplined for what she did? Again, I think she needs to undertake an overt act. Going outside the chain of command is one example. An express statement to her superiors that she's reporting fraud is another example. When I talk about her duties or her actions in this case being within the scope of her employment, what I'm referring to is the preparation of the financial reports, the preparation of the performance reports. Those were within the scope of her duties. I don't think that she was specifically tasked for looking for fraud in this case. In acting within the scope of what she was assigned to do, she happened to uncover what she alleges was fraud. It's a district position it wasn't. At that point, she needs to put her employer on notice that what she intends to report is fraud, not financial statements and not performance reports. So this may be a bad analogy, but I'm just trying to think of what has to happen in this sense, that the employee is preparing the reports. She discovers that the procedures are inconsistent with not only regulation, but District of Columbia law, federal law. And where she reports that to her supervisor, when does the false claim kick in? Right, exactly. That alone does not satisfy the False Claims Act. What she has to report is not noncompliance with other laws and regulations, but fraud. She doesn't have to understand that she has a right under the False Claims Act, but she has to understand that someone's stealing from the government, and that's what she has to intend to convey, that there is a theft going on, that someone is being paid for something that they're not entitled to receive payment for. And we don't have that here. Isn't that a jury question also? It seems like at least a number of the things that she's talking about, undocumented expenses, et cetera, I guess you could regard those as failures to document, but you could also regard those as suggestion that expenses never occurred. But that's not sufficient. Again, Your Honor, she has to intend to convey fraud. And I'll point, Your Honor, to this Court's decision. When you say intend, you mean her subjective intent? She has to have a subjective belief that she is disclosing fraud. And I think if you look at the reports in this case, that she's not intending to disclose fraud, what she's intending to disclose is financial irregularities, accounting problems.  She's going to testify that she was reported. Well, she had an opportunity to testify in this case. The word fraud doesn't appear anywhere in her testimony. Fraud isn't the only word in the list of things, is it? Illegality with respect to fraudulent claims. Not simply illegal. Well, the question is whether a jury could, whether this is so clear on the face that no jury could conclude that she was talking about fraud rather than other things. And I think it is, Your Honor. Can I just get a focus on the Peck theory? Your Honor, again, I think there's no question that Peck was aware of the disclosures. I think, viewing the evidence in the light most favorable to the plaintiff, Ms. Saunders, that Peck was upset with her. The difficulty we have here is that we don't have any evidence that Peck caused her termination. There was a causal connection between the animus that Peck felt. And, again, the animus in particular is also an issue with respect to Peck because we don't know if she had animosity simply because the financial irregularities were disclosed or whether she had animosity because fraud was disclosed. And the FCA, again, only protects animosity related to fraud-related disclosures. So if Peck had animus towards her for any other reason besides having uncovered fraud, then that's not protected by the FCA. So there's really no indication that Peck was upset about the discovery of fraud versus the discovery of OCTO's apparent inability to keep records and prepare financial statements. It's like that lashes this question to the prior one. If a reasonable jury could conclude there was fraud or that she had uncovered fraud, then presumably it would follow that the employer was on notice that there was fraud being discussed. Right. Certainly, if you can view the record as disclosure of fraud, then I think that's the first step, that she engaged in a protected activity. I think Peck was aware of the disclosure, so I think you get knowledge. But at what point? The next step in the analysis is causation. What did Peck do to cause her termination? I think the record here is just simply, as you said, Judge Rogers, they haven't connected the dots. Peck has animus. Eleven months after she expresses that animus, Ms. Saunders is terminated by an entirely different person, Dr. Gandhi. There's no evidence of communications between Peck and Williams, the mayor, and Williams and Gandhi. We have simply Gandhi is agreed here as the decision-maker in this case. And so there's simply no evidence from which a rational, reasonable jury could infer that Peck caused her termination by undertaking some overt act that led Gandhi to make the decision to terminate her. And so I think that's where the kind of cat's paw theory that they rely on with respect to Peck fails, and the district court agreed with that as well. That was the basis of the district court's decision, that there simply was nothing connecting Peck to the actual decision to terminate Ms. Saunders, notwithstanding her complaints. Further questions from the Peck? No. Thank you. Thank you, Your Honors. We ask that you confirm. Yeah. Well, you went way over, not your fault, but I'm speaking now to the panel. But nonetheless, we'll give you another minute. Can we confine your reply to the scope of the case? Yes. In light of the previous case, your reply should be confined to the scope of the other counsel's argument. Thank you, Your Honor. The government argues that Ms. Saunders did not have a subjective belief that she was disclosing fraud. Two brief responses to that argument. First, that's not what's required. Her subjective knowledge of whether it was fraud or whether she used the word fraud. I think we were trying to explore with counsel when the line is crossed. The line between fraud and? When you have a whistleblower false claims act cause of action. This Court has said that that line is crossed whenever the activity is something that reasonably could lead to an action under the False Claims Act, which makes no mention of what she subjectively believes she was reporting on. But looking more specifically to the factual issue in this case, Ms. Saunders' original report. So your theory is, just so I'm clear, that any time an employee whose job is to prepare financial statements and that employee discovers money has been paid out without the records that are required by statute or regulation, that if a subsequent adverse action is taken against that employee, that employee has a whistleblower false claim? Not any time, Your Honor, but in the facts of this case. No, no, you've got to stick with me on this because I think that what the evidence shows in terms of Mrs. Holt telling her client that the Office of Technology was in a mess, go look at these 15 boxes, that that's the context in which we have to look at your client's claim. Not your client, your friend. Well, your friend has amicus on behalf of Mrs. Saunders, the plaintiff. Correct. And that is the context in which she was hired specifically to create those financial reports. However, it's our argument that what she discovered and what she reported and the results of that report were much broader than anything that Ms. Holt expected to find, that Congress expected to find, that even Ms. Saunders expected to find. This was serious discrepancies in the reporting, and it's the type of activity that raises... And you reject the notion that the context in which this occurred is relevant here? No, Your Honor, I think the context is quite relevant, and I think that the context is something that... Congress has found that the district's books are in a mess, that they're inadequately documented, that you can't tell whether they're surpluses or deficits. Fix it. Correct, Your Honor. That's the context. Yes, Your Honor, and that context supports Ms. Saunders' theory that she was... And she confirms what Congress has already found. Congress did not know the extent of... Oh, yes, it did. It had long hearings. Anyway, okay, so your point is there really is no line, that if she finds fraud, that's it? If she finds fraud and she reports it outside of her chain of command to put her employer on notice... So it's the chain of command is the key here, even though these are the very people that led to her original assignment? Chain of command is definitely part of the analysis under the Martin Baker aircraft case, but she was also reporting on activities that reasonably could lead to an action under the False Claims Act, and that's the type of activity that this Court seeks to protect people from disclosing. All right, are there further questions from the bench? No. Do you want a one-second wrap-up here? Yes, Your Honor, we just submit that there are numerous issues that Ms. Saunders should be entitled to have a jury resolve, and summary judgment was inappropriate. Thank you for your time. Mr. Parks and actually Mr. Birch, you were appointed as amicus by the Court, Mr. Park, and this is Ms. Hicks. You were all appointed derivatively, and the Court is grateful for your assistance in this manner. Thank you. We'll take the case under submission. We're going to take a brief break while the attorneys change positions here.
judges: Garland, Rogers, Ginsburg